UNITED STATES DISTRICT COURT  **FILED**

DISTRICT OF CONNECTICUT  2004 MAR 31  P 1: 52

LINDA JABREN                    :

     v.                          :    CIVIL NO. 3:02cv100(AHN)

U.S. DISTRICT COURT
BRIDGEPORT, CONN

JOHNSON CONTROLS, INC.          :

## RULING ON MOTION FOR SUMMARY JUDGMENT

Linda Jabren ("Jabren") brings this employment discrimination action against her former employer, Johnson Controls, Inc. ("JCI"). She alleges that JCI impermissibly discriminated against her on the basis of gender in violation of Title VII and on the basis of her sexual orientation in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, when it suspended and then terminated her employment. Jabren also alleges that she was terminated in retaliation for complaining of sex discrimination by her male co-workers in violation of Title VII and CFEPA.

JCI has moved for summary judgment on all of Jabren's claims on the grounds that the facts do not support a prima facie case on any claim and that there is no evidence that the legitimate, non-discriminatory reason for its action was a pretext for discrimination or retaliation.

For the following reasons, JCI's motion for summary judgment [doc. # 28] is DENIED.

<u>FACTS</u>

Jabren submits the following facts in support of her claims of discrimination.  The court construes these facts in a light most favorable to Jabren.

Jabren began working for JCI as a facility mechanic on October 30, 2000.  She was hired to provide services to JCI's customer, Pfizer, Inc., at its Groton, Connecticut location. Jabren had previously worked as a maintenance mechanic at Foxwoods from 1993 to 2000.  JCI's Human Resources Specialist Dawn Vernieri ("Vernieri"), Michael Amenabar ("Amenabar"), and Project/Facility Manager James Nelson ("Nelson") were all involved in the decision to hire Jabren.

At the time Jabren began work, JCI's maintenance mechanics were divided into two crews: the North Campus Team ("NCT") and the South Campus Team ("SCT").  These teams included JCI mechanics and mechanics employed by Pfizer.

At all relevant times, Jabren was the only female employee on either the NCT or SCT.  The only other female maintenance mechanic employed by JCI worked on an off-site location.

Jabren was first assigned to the NCT.  That team was comprised of four male JCI employees and three or four male Pfizer employees.  Amenabar was Jabren's supervisor.  He reported to Nelson on general matters and to Vernieri on human resources issues.  Amenabar and Vernieri worked closely together and shared

2

an office.

Amenabar knew that the hiring of a female maintenance mechanic was generating unrest and rumors, one of which was that Jabren had made complaints to her former employer about sexual harassment.  He felt that having a woman working on one of the teams was causing a sense of unsettlement.

When Jabren began working on the NCT, none of the male co-workers would have anything to do with her.  They wouldn't answer her questions, share work assignments or socialize with her. When she entered a room, the male workers left.  Because of this shunning treatment, Jabren was unable to do her job, and spent most of her first few weeks following the male workers around.

During those first few weeks, Jabren met with Amenabar several times to complain about this treatment.  She told him she believed that she was being ostracized because she was a woman. Amenabar agreed that the problem could be caused by having a woman on the team for the first time.  None of these meetings was documented in writing.

In December 2000, Jabren went out on sick leave for five days.  On the fifth day she called Amenabar, but spoke to Vernieri.  Jabren told Vernieri about the difficulties she had been having with her male co-workers during the prior weeks, and that she had spoken to Amenabar about the problem.  In particular, she reported one incident that had sexual overtones

3

which had made her uncomfortable.  Vernieri believed that the
conduct Jabren described would constitute a violation of JCI's
sexual harassment policy.

After Jabren spoke to Vernieri, Vernieri conducted several
meetings and interviews.  She learned that the male employees
were concerned about having a woman working with them, were
afraid that she might file a complaint of sexual harassment
against them because of their use of coarse language, and felt
they had to be on their guard because of her.  The use of coarse
language violated JCI's sexual harassment policy.  Nonetheless,
Vernieri closed her investigation with the conclusion that Jabren
had not suffered any sex discrimination, and no JCI employees
were disciplined because of Jabren's complaint.

Instead, Jabren was placed on a 90-day temporary transfer
from the NCT to the SCT.  JCI intended to use the 90-day period
to train the workers on how to get along with others in the
workplace and on sexual harassment issues.  In addition, Jabren
was told she would be assigned a mentor to help her become more
comfortable in the workplace.  JCI did not conduct the training
and did not assign a mentor to Jabren.

Employees of the facilities maintenance teams regularly used
coarse and vulgar language as well as offensive, sexually-
denigrating terms to describe women and sexual activities.  Such
language and conduct violated JCI's sexual harassment policy.

4

Male employees also routinely "horsed around" with each other by back slapping, punching, and using nicknames.

Jabren began working on the SCT on January 2, 2001. Even before she began, the male team members were talking about her. They all felt they would have to "walk on egg shells" because of her, that they would have to watch their language, that she might file a sexual harassment claim against them, and that she was getting paid more. They also told stories about her problems on the NCT.

On January 30, 2001, Richard Cushing ("Cushing"), a JCI employee, made a complaint about Jabren to Brian Wright ("Wright"), a Pfizer supervisor. Wright related the complaint to Amenabar. Amenabar and Vernieri investigated the complaint. Cushing complained of three separate incidents involving Jabren. One involved an incident that occurred on January 15, 2001. He said he was in the kitchen and that Jabren walked by and ran her hand across his lower back. A male co-worker who was present said that Cushing responded with a rude comment that referred to Jabren's gender, along the lines of "that bitch." The second incident occurred on January 25, 2001, when Jabren called Cushing "Richie baby" in front of another employee. Cushing responded "I am not your baby." Jabren walked away, but returned a few seconds later and apologized. Four days later, the third incident occurred. Jabren stood behind Cushing, who was seated

5

at the break table, and rubbed his shoulders. Cushing said "don't touch me," and Jabren stopped and apologized. Cushing said that these incidents made him uncomfortable and that he believed that Jabren was "coming on to him." He thought it was a serious breach of protocol for one employee to touch another. He said he couldn't speak to Jabren about it because he was intimidated by her. Even after he learned that Jabren was a lesbian, he still believed she had been coming on to him.

Vernieri reviewed Cushing's complaint and concluded that Jabren's unwanted touching and her use of "Richie baby" violated the no harassment policy because it made Cushing uncomfortable even though the conduct was not sexual in nature. As a result of Cushing's complaint, Jabren was suspended for three days. The decision was made by Vernieri, Nelson and Jeff Sharpton ("Sharpton"), an off-site regional HR manager.

The next complaint about Jabren was lodged by a Pfizer employee on the SCT, Tim Atherton ("Atherton"). Jabren knew Atherton's brother before she worked for JCI. Jabren felt she had a good relationship with Atherton. She had told him she was a lesbian, and that she had been suspended because of Cushing's complaint. The incident leading to Atherton's complaint occurred on February 28, 2001 in the break area in front of a number of co-workers. Jabren, who was standing behind Atherton, placed her hands on his shoulders. At that time, all conversation stopped

and everyone stared at them.  Atherton became uncomfortable because he thought he had done something wrong.  He did not believe that Jabren was coming on to him.  Atherton said that later that evening three co-workers, including Steve Glidden ("Glidden") and John Ambrose ("Ambrose"), approached him and told him that he needed to complain about Jabren's touching.  They suggested that it would be hard for him to explain to his wife what had happened if he did not complain.  Atherton was also approached by Charles MacDougal ("MacDougal") and Cushing. MacDougal told Atherton that he needed to complain about the incident.  MacDougal said he gave that advice to Atherton because he felt Atherton needed to cover his backside to protect his job.

Atherton felt this pressure to report the incident and that if he didn't do so, others would, and that would be worse for Jabren.  So Atherton went to his supervisor, Brian Wright ("Wright"), and then he and Wright met with Amenabar.  Atherton told Amenabar that he felt uncomfortable when Jabren touched his shoulders because everyone in the shop went quiet and stared at them.  Vernieri did not meet with Atherton about this complaint, but stated that she did not believe the incident constituted sexual harassment.

Vernieri and Amenabar placed Jabren on an indefinite suspension pending their investigation of Atherton's complaint. Vernieri met with Nelson and Sharpton, and the decision was made

7

to terminate Jabren.  Amenabar sent a termination letter dated March 13, 2001 to Jabren.  It stated that she was being fired because of her violations of JCI's no harassment policy, specifically, the sexual harassment complaint filed by Atherton and the earlier complaint filed by Cushing.

There is conflicting evidence and testimony as to whether Vernieri, Nelson, and Sharpton considered or described Jabren's conduct as sexual harassment.  Vernieri believed Jabren's conduct violated the no harassment policy because it created a hostile environment.  Amenabar and Nelson believed that Jabren's conduct constituted sexual harassment and that the conduct was sexual in nature.

The two versions of JCI's no-harassment policy, inter alia, describe harassment as including slurs, jokes, and other verbal, graphic or physical conduct relating to an individual's race, color, sex, religion, sexual orientation, national origin, citizenship, age or disability.  Another version of the policy describes harassment as including sexual advances, requests for sexual favors, unwelcome or offensive touching and other verbal, graphic, or physical conduct of a sexual nature.  The policy strictly prohibits sexual harassment consisting of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, as well as conduct that denigrates or shows hostility or aversion toward an individual

because of race, color, religion, sex, sexual orientation, national origin, age, disability, marital status, or conduct that has the purpose or effect of creating an intimidating, hostile or offensive work environment, or conduct that unreasonably interferes with an individual's work performance, or that adversely affects an individual's employment.

During the relevant time period, Nelson and/or Vernieri also investigated and disciplined male employees for violating the no harassment policy. Specifically, MacDougal was given a four-day suspension for threatening violence against a co-worker and describing the music another worker was listening to as "jungle bunny music." Glidden was given verbal counseling for sending sexually explicit email messages. Paul McCormick was given verbal counseling because of a complaint that he mimicked stereotypical behaviors of gay and disabled people, and because he misused company property to run his second business while working for JCI. McCormick was subsequently terminated after a second complaint alleging the same conduct. Richard Huskey was given a verbal warning because of a complaint that he made a sexually explicit remark in front of a JCI contractor, and was subsequently terminated after an incident in which he placed an air horn on the seat of a female employee's pants, and discharged it against her buttocks. John Ambrose was given a one-week suspension because of a complaint that he repeatedly made racist

comments to an African-American co-worker and another African-American who worked for a JCI contractor.

## STANDARD

On a motion for summary judgment in an employment discrimination case, the court must examine the record as a whole, just as a jury would, to determine whether a jury could reasonably infer from the totality of the relevant facts, an invidious discriminatory purpose on the part of the employer. See Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000).

A district court should exercise particular caution in deciding whether summary judgment should issue in an employment case. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir.), cert. denied, 530 U.S. 1261 (2000). But this does not relieve the court of its responsibility to carefully scrutinize the depositions and affidavits for evidence that, if believed, would show discrimination and determine whether the non-moving party has submitted sufficient probative evidence that would be sufficient to support a jury verdict in her favor. See Goenaga v. March of Dimes, 51 F.3d 14 (2d Cir. 1995).

## DISCUSSION

Jabren's Title VII and CFEPA claims of sex discrimination and retaliation are analyzed under the same McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), burden-shifting

framework.  See Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87,
94 (2d Cir. 2001).  To establish a prima facie case of Title VII
and CFEPA discrimination, the plaintiff must show that (1) she is
a member of a protected class; (2) she was qualified for the
position; (3) she experienced an adverse employment action; and
(4) the adverse employment action occurred under circumstances
giving rise to an inference of discrimination.  E.g., Weinstock
v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing
McDonnell Douglas, 411 U.S. at 802).

    With regard to a prima facie case for retaliation, the
plaintiff's showing is somewhat different.  She must demonstrate
that (1) she engaged in protected activity; (2) the defendant was
aware of her participation in protected activity; (3) the
defendant took adverse employment action against her; and (4)
there is a causal connection between the protected activity and
the adverse employment action.  See Cruz v. Coach Stores, Inc.,
202 F.3d 560, 566 (2d Cir. 2000).

    If the plaintiff makes out a prima facie case of
discrimination or retaliation, a presumption that the employer
unlawfully discriminated against the plaintiff is created, and
the burden shifts to the employer to articulate a legitimate
nondiscriminatory reason for its actions.  E.g., Quaratino v.
Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995).  If the employer
does so, the burden shifts back to the plaintiff to establish

                                11

that the employer's stated reason was merely a pretext for discrimination.  E.g., Reeves v. Sanderson Plumb. Prod., Inc. 530 U.S. 133, 143 (2000).

    A.    Jabren's Prima Facie Case - Discrimination

    JCI concedes that Jabren can establish the first three elements of her prima facie case of sex discrimination.  The dispute thus centers on the fourth element-that the adverse action occurred under circumstances giving rise to an inference of discrimination.

    Taking the facts in the light most favorable to Jabren, and bearing in mind that her burden at this stage is minimal, see Carlton, 202 F.3d at 134, the evidence submitted by Jabren concerning the circumstances surrounding her termination could lead to a reasonable inference that sexual discrimination played at least some role in the decision.  Jabren's evidence describes a work environment that was permeated with animus and open hostility towards women in general and Jabren in particular, and shows that JCI knew of the pervasive hostility but did nothing to stop it.  An inference of discrimination could also be drawn from the evidence showing that Jabren's presence in the all-male workplace caused an atmosphere of unease, insecurity, concern and worry on the part of her male co-workers, and that JCI did nothing to ease the tension.  Evidence of the coarse and vulgar language and slurs directed to or describing women, including

Jabren, that was commonplace among her co-workers, coupled with evidence that JCI was aware of it but did not make any effort to stop it, also supports an inference of discrimination. Also, evidence that Jabren was terminated for conduct that was arguably less egregious than the conduct of the male employees who were terminated for violating the no harassment policy is also relevant, as is evidence that JCI routinely ignored similar conduct when men engaged in it.

Moreover, with regard to JCI's claim that the same actor inference negates any finding of discriminatory motive or intent, the court notes that such an inference "should not be used as a substitute for a thorough factual inquiry." Ramos v. Marriott Int'l, 134 F. Supp.2d 328, 345 (S.D.N.Y. 2001).

B.    Prima Facie Case - Retaliation

Because JCI does not dispute the first three elements of the prima facie case of retaliation, Jabren can avoid summary judgment if she can show the existence of a factual issue as to whether there is a causal connection between her complaints of discrimination by her co-workers and her termination.

The required causal connection can generally be established by showing a temporal proximity between the protected activity and the adverse employment action. See Duviella v. Counseling Serv., 52 Fed. Appx. 152, 154 (2d cir. 2002) (noting that proximity in time can be enough to make a prima facie case of

13

retaliation); <u>Quinn v. Green Tree Credit Corp</u>, 159 F.3d 759, 769 (2d Cir. 1998) (holding that a discharge less than two months after sexual harassment complaints is prima facie evidence of a causal connection between protected activity and retaliation). Causation may also be shown through evidence of disparate treatment of other employees who engaged in similar conduct.  <u>See Johnson v. Palma</u>, 931 F.2d 203, 207 (2d Cir. 1991).

Here, because only two months elapsed between the time Jabren complained of the treatment by her co-workers and her termination, Jabren has made out a prima facie case of retaliation.  This is so despite JCI's claim that the causal connection established by such temporal proximity is broken by the intervening circumstances surrounding Jabren's alleged violation of the no-harassment policy.  JCI's argument ignores the factual dispute surrounding the enforcement and interpretation of JCI's no-harassment policy vis-a-vis Jabren and her conduct.  Accordingly, because of the close proximity in time between Jabren's protected activity and her termination, the causal connection element of her prima facie case is established.

C.  <u>JCI's Non-Discriminatory Reason</u>

Under the <u>McDonnell Douglas</u> burden shifting requirement, once the plaintiff establishes a prima facie case, the burden shifts to the employer who must proffer a legitimate, clear, specific and nondiscriminatory reason for the employment action.

14

See <u>Carlton</u>, 202 F.3d at 134; <u>Quaratino</u>, 71 F.3d at 64.  This
burden is not demanding.  The employer only needs to offer a
business explanation for its action.  <u>Bickerstaff v. Vassar
College</u>, 196 F.3d 435, 446 (2d Cir. 1999).

JCI has met its burden.  It submits that Jabren was
terminated because the two sexual harassment complaints that were
filed against her by her male co-workers violated the company's
no-harassment policy.

    D.    <u>Pretext</u>

Because JCI has articulated a non-discriminatory reason for
the employment action, Jabren must come forth with evidence that
reasonably supports a finding that the articulated reason was
merely a pretext for discrimination.  <u>James v. New York Racing
Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000).  A plaintiff may survive
summary judgment at this stage by showing that the employer's
proffered reason was not the only reason and that impermissible
discrimination was a motivating factor.  See <u>Cronin v. Aetna Life
Ins. Co.</u>, 46 F.3d 196, 203 (2d Cir. 1995).

Proof that the employer's explanation is unworthy of
credence is one form of persuasive circumstantial evidence that
is probative of intentional discrimination.  <u>Reeves</u>, 530 U.S. at
149; <u>Byrnie v. Town of Cromwell Bd. of Educ.</u>, 243 F.3d 93, 102
(2d Cir. 2001).  In appropriate circumstances the trier of fact
can reasonably infer from the falsity of the explanation that the

employer is dissembling to cover up a discriminatory purpose.
See Reeves, 530 U.S. at 147.  Evidence that an employer's reason
is false, combined with the evidence establishing a prima facie
case can, in some circumstances, be enough to sustain plaintiff's
burden without further evidence of discrimination.  A combination
of factors, even if any one alone would not be compelling, may be
sufficient evidence to allow a jury to conclude that the
defendant's proffered reason was pretextual.  Id.

    Here, Jabren submits evidence that appears to contradict or
discredit JCI's asserted reason that she was terminated because
the two sexual harassment complaints against her violated its no-
harassment policy.  Specifically, Vernieri initially testified
that Cushing's complaint was not a sexual harassment complaint,
that Jabren's conduct was not sexual in nature, and that in
making the decision to suspend Jabren no one described her
conduct as sexual harassment.  Vernieri also testified that
Atherton's complaint was not a sexual harassment complaint and in
making the decision to terminate Jabren there was no discussion
of sexual harassment.  However, after Vernieri was shown Jabren's
termination letter, she changed her testimony and recalled that
both the Cushing and Atherton complaints were sexual harassment
complaints and that she, Nelson and Sharpton all agreed that
Jabren's conduct was sexual harassment.  Upon further
questioning, Vernieri said that with regard to the incidents

16

involving Cushing, only the "Richie-baby" comment could have constituted sexual harassment. Vernieri's testimony conflicts with the testimony of Amenabar and Sharpton, both of whom subjectively believed that Jabren's conduct constituted sexual harassment, but for different reasons. Such shifting, contradictory, and inconsistent interpretations of JCI's no-harassment policy and the reasons for concluding that Jabren violated the policy raise credibility issues and could also lead a reasonable jury to find that the stated reason was pretextual. See Tolbert, 242 F.3d 58, 70 (2d Cir. 2001). This, together with the totality of the evidence supporting Jabren's prima facie case, is sufficient to allow a jury to determine whether sex discrimination and/or retaliation were motivating factors in the decision to terminate her employment. See Reeves, 530 U.S. at 147.

## CONCLUSION

For the foregoing reasons, JCI's motion for summary judgment [doc. # 28] is DENIED.

SO ORDERED this 31st day of March, 2004, at Bridgeport, Connecticut.

_____
Alan H. Nevas
United States District Judge

17